Would the lawyers who are going to argue this case please stand and tell us your names and spell your names for the court, please. Good afternoon, I'm Rich Bergman for Krishna Schaumberg Tan, B-U-R-G-L-A-N-T. Good afternoon, Ben Thompson here for Claudia Secura, T-H-O-M-A-S-S-E-N. Mr. Thompson, are you planning to argue as well on behalf of your client or? Yes. Yes. Okay. So we. Did you work out something? Yeah. Sure. That's fine. We do have a cross appeal. Right. And I wanted to ask if you want to reserve any of your time to respond on the cross appeal. Just a little bit. So may you reserve two minutes of your 20 and so you each get nine. That's fine. Does that work? That's fine. Okay. And then decide amongst you who's going to handle the cross appeal. Unless you really both. All right. Then, Mr. Lucas, whenever you're ready, you may proceed. And let me, before you start, remind you to keep your voices up. This microphone does record, but it doesn't amplify, and there are people all the way in the back who want to hear every word. Thank you, Your Honor.         Counsel? Counselor? Counselor? Counselor?                 Counselor? Counselor? Counselor? Counselor? Consultant? Counselor? Counselor? Counselor? Counselor? Counselor? Counselor? Counselor?    Counselor?             Counselor? Counselor? Counselor? Counselor? Counselor? Counselor? Counselor? Counselor? Counselor? Counselor? Counselor? Consultant? May I ask, what's the business of this entity? Dr. Schomburg tan, I think, the policy covers their business. That's clear. Is this a tanning salon? What is this? Counsel will correct me, but it's my understanding it's a tanning salon and it's a franchise of L.A. tan. So they have a lot of potential cancer claims. That's not his problem today. It sparked my interest. I was wondering what the nature of the business was. Yes. Considering what primarily is intended in getting a policy. Right. Mr. Lucas, I neglected to ask you, do you want to reserve some time for rebuttal as well? Yes, I would. Five minutes. No, five minutes is fine. Thank you. Proceed. Mr. Lucas, can I ask you about your policy? Yes, ma'am. And you use the term publication, correct? Right. And I noticed the trial court used the term dissemination. And also in other cases that I read, they talk about distribution. All these different terms have been used as far as, I guess, getting it out there, getting it to someone else. Now, it struck me that one of your arguments is that, of course, this is not a publication. But wouldn't it be prudent or would it have been better to have a definition of publication in your policy so that it would be fairly clear as to what we're talking about? Well, I suppose, Your Honor, if we had a definition, you know, then there still might be arguments that the definition isn't clear. But I suppose a definition might be useful. But as we know, you know, all terms in an insurance policy aren't defined. They can't be. You know, the policy which is many pages to begin with would be many more. But absent a definition, I think we all agree that we look to common understanding, correct? Correct. A dictionary definition. Correct. But doesn't it create an ambiguity, then, if there are different ways that reasonable people would construe that term? Well, I think the courts generally have held that the fact that a term is not defined in the policy doesn't necessarily mean that the term is ambiguous or that an ambiguity exists. And in this case, our principal argument on publication is that the Illinois Supreme Court defined the term in the Valley Forge case. Well, did it?  I think it did, Your Honor. I mean, it was talking about something very different there, right? The defense of the insured in that case was that there had to be private information disclosed and that there wasn't. And so they said, look, it was broadly disseminated. That's all we need for publication. Well, the private information and whether third-party disclosure is required, that was really in the appellate court in Valley Forge. In the Supreme Court, the Supreme Court was construing the same coverage. Actually, publication had dropped that as an issue in the Supreme Court, right? They said, well, this is not really an issue, but we're going to go ahead and define it anyway. No, we're going to define the term publication because we want a coherent understanding of the coverage as a whole. So the court defined not only the term publication, but the term material and the term invasion of privacy, all as they apply to the invasion of privacy coverage. And that's the same coverage that's involved in this case. Well, let me ask you, it's not an issue in the case. Could it be a holding of the case? And how do we consider that? Is that just an advisory opinion? Well, I suppose someone could say it's dictative, but I would also suggest that when the Supreme Court defines a term in the context of this insurance coverage, that you go contrary to the Supreme Court's definition at your peril. Okay, but I'm equivalent with you that they defined it. All they really said is that the alleged conduct amounted to publication. This is publication. We don't say what else might be publication. We say this is publication. We don't say that nothing else but this is publication. Well, again, Your Honor, I think I have to disagree because the court said, okay, let's look at the provision, and one of the terms is publication. And how do we define the term for the invasion of privacy coverage? And so the court went to the dictionary, and they looked at four definitions of the term publication. They took two from Webster's, and they took two from Black's Law Dictionary. And the Supreme Court, the definitions it chose for publication for invasion of privacy, the two from Webster's were communication as of means or information to the public or the act or process of issuing copies for general distribution to the public. The two Black's Law Dictionary definitions it selected were generally the act of declaring or announcing to the public and the offering or distribution of copies of work to the public. Well, if we're going to go back to Black's, Black's also specifically for purposes of defamation, defines it as publication only to one person. Share with one person, that's publication, right? That's very true, Your Honor. Okay. I'm going to go back to the definitions of publication. And I just want to point out, I think it's important to point out that this is a very complicated matter. I'd also point out. And Sarkaria, in her brief, she said several definitions of publication for defamation purposes that it's for defamation purposes it's adequate for communication to a single person. So does it mean something different in your policy in these two sections, one's for defamation and one's for red privacy? They both say oral or written publication. This publication means different things. They both say that. I agree. But I point out several points. First, the Supreme Court selected definitions to use for an understanding of the invasion of privacy coverage for publication. That only included references of communication to the public. And then it applied those definitions to the underlying allegations in the TCPA case and said, well, there's there's publication communication to the public in the TCPA context, because we have one individual sending out blast faxes to thousands of people. So in that sense, the individual is communicating to thousands of people. There's communication to the public. The Supreme Court didn't select any of those definitions that are quoted in Sarkaria's brief. There are publications to for the individual. And it didn't apply the definition of publication in the TCPA context. It didn't say it was sufficient for communication to a single person. It said it's communication to all of these class recipients that is publication. So when we're talking about publication for invasion of privacy purposes, it's communication to the public. And I agree with Your Honor that in the defamation context, it can be shown by communication to a single person. So does it mean something different in those two provisions of your policy? I think it does. And I think it does because not only are they separate provisions, they're not the same provision. It's separate coverage. The defamation is separate from the invasion of privacy. And it's a separate tort. Under the law, invasion of privacy is separate from defamation. And one of the things that Sarkaria says the Defender Security Seventh Circuit opinion, and there are the Seventh Circuit courts, Section 632, I think it is, or 652 of the restatement of torts, where the point is made that in defamation, publication can be established by communication to a single person. But in invasion of privacy under the law, it's it's established by communication to the public at large. So the Supreme Court's definition of publication as used in Valley Forge and as applied to the allegations in Valley Forge is communication to the public. Counsel, let's say for hypothetical purposes, hypothetical purposes, Valley Forge doesn't exist. What's your next case you rely on? Yes. There are cases from out of state that hold that in the context of invasion of privacy, publication means communication to the public. There are out-of-state cases, but for state cases, we rely on the Supreme Court. And I think, you know, we're in pretty good stead in relying on the Supreme Court. And when we apply that, those concepts from Valley Forge to this case, when we look at the Sakura complaint, there are no allegations of communication or disclosure of. I think that's clear, that there's one communication. There's just one communication alleged, and that's to. Before you run out of time, do you want to address the exclusion? Yes, Your Honor, I do. Thank you. The exclusion in violation of statutes exclusion. And the exclusion applies to bodily injury, property damage, personal injury, or advertising injury arising directly or indirectly out of any action or omission that violates or is alleged to violate the TCPA, can spam, or any other statute other than TCPA. What's the significance of the title of that exclusion? Well, I assume. You're aware of the title of that exclusion, yes? Of course. And methods of sending material is in there. E-mails, fax, phone calls, or other methods of sending material or information. So we take the title and we look at the exclusion as a whole. And I think the only reasonable way to interpret the statute, I'm sorry, the exclusion, is that it applies to statutes that prohibit or limit the communication of information regardless of the method utilized. That's the import of the exclusion. And when you look at the circuit court's ruling in this case, it held that the exclusion was inapplicable for two reasons. First, it found that BIPA was not a statute that prohibited or limited the communication of information. And second, it latched onto this methods of communication and said BIPA wasn't concerned with methods of communication. Do you disagree that BIPA is not concerned with the methods of communication? I don't think you can read BIPA. I don't think you can read Section 15D of BIPA and say it's not a statute that prohibits or limits the communication of information. I understand that. But what about methods? If, in fact, this exclusion is limited to methods, do you agree that BIPA does not regulate the method by which you communicate information? Well, BIPA is not concerned with the method. BIPA is concerned with the communication. The substance. The substance. Well, the act of communicating the information. Certain kinds of information. Right. Okay. And which is exactly what is excluded by the statute. And the other point I'd make regarding the exclusion is that the defendants argue that, well, the catch-all, that paragraph 3 of the exclusion that applies to any other statute that prohibits or limits the communication of information or material, it only applies to statutes that are like TCPA. And BIPA is nothing like TCPA, according to the defendants. But when you look at how the Supreme Court has interpreted both of those statutes, TCPA and BIPA, that argument doesn't hold up. In Valley Forge, the Supreme Court said that TCPA, or the purpose of TCPA was to protect the individual's right of privacy in terms of the security interest,  In Rosenbach, the only Supreme Court held that BIPA was enacted to protect the individual's privacy right and the protection of their biometric information. So both statutes have the same interest at heart, the protection of privacy. In TCPA, it's protection of the security interest. In BIPA, it's the protection of the biometric data interest. And both statutes provide that it's the communication of information, whether it's a blast fax in TCPA or biometric information that's in BIPA, that is the violation of the statute. And both statutes provide for damages when they're violated. So it's clear that you can't say that BIPA is somehow different from TCPA and therefore the catch-all provision of the exclusion applies. I'm going to have to stop you there if you want to save some time. I assume you'll address the cost appeal of your response.  Thank you very much. Thank you. Good afternoon, Your Honor. This is Rich Berglund for Krishnatan. I'd like to start off by noting that the justices did observe that there were some significant problems with Valley Forge. Justice Connors, you observed that the quote-unquote definition of publication comes by form of dicta. Justice Mikva, you also recognized that there was no definition of the term publication, but rather merely a recognition that one of the common meanings of the term could include the communication or dissemination of information to the public. That's not to say that it only includes that, but rather that that is one form of communication that's recognized as a publication. And so in front of this argument, I was trying to figure out, you know, why did the Supreme Court decide to do that with publication? We spend a lot of time doing that. And so I think I figured out it's because of the difference of the nature of the privacy violation. Okay? So the TCPA violation, the Supreme Court recognized, was an invasion of the privacy by intrusion. So it's a seclusion invasion, right? That does not require any sort of disclosure of private information. So in order to see if the policy applied, which it ended up finding that it did apply, and there was coverage for the TCPA violations, it had to look at publication because that wasn't a necessary element of the type of the violation of privacy. But then if you also look at page 368, the Supreme Court recognized a separate type of invasion of privacy, and that is invasion by privacy by disclosure of private acts. That's exactly what we have here. And so if you further look at that paragraph, again, page 368, the Court defines, recognizes that there's a definition of invasion of privacy by disclosure of private facts, as, and this is in quotes, the public revelation of private information about another in an objectionable manner. Again, that's exactly the type of violation that we have here. So the Court alleges that she had alleged facts that qualify as an invasion of privacy by disclosure of private facts, right? She alleges that my client, Krishna, had her private secret information and that Krishna disclosed that to a third party outside of the circle of trust, making that private fact as between those two parties public. Counsel, I'm going to ask you, as far as your analysis, as far as a security interest versus a private privacy interest, are there cases that you could talk to that say one is more important than the other? I don't know if the importance necessarily of one over the other is distinct. You're making that argument, though, you're not going to say the entire... Well, I'm making the argument in that it makes this case different from Valley Forge and it describes why Valley Forge went that next step, even though the insurers dropped the argument. The insurers said, we're not even contesting that. And then the Supreme Court went to it and said, all right, we need to figure out one of the common meanings of the term publication because in order for us to examine the entire policy provision, we have to do that. Even though the insurers dropped the argument, we still have to look at that. It would be my argument here before the court that due to the nature of the privacy violation, that is the disclosure of a private fact, that the publication term is a redundancy with that type of privacy violation. And that goes, that dovetails with what the circuit court came up with in saying that this was a common understanding of the term publication could include dissemination of information, which is what we have here. So I believe that that's why the court got to that. It didn't really tell us that, but it kind of did by stating on multiple occasions that this was an intrusion into seclusion  which is invasion of privacy by disclosure of private facts, which is what we have here. In terms of the methods, exclusion, another thing that I was doing with preparing for this argument was trying to figure out what was the deal with this endorsement. It's very odd the way that the title reads. And I looked at the endorsement and examined it, and it looks like it's a manuscript endorsement that was prepared by West Bend. This is not an ISO form. It's not a CG form. It's a West Bend form. So they chose that title. They chose those words. But the title isn't something that we can really construe. It's what's in the body, right? We have to construe the whole thing together. But think about it if you're the insurer and you're reading your policy and you're reading the list of forms that are on the policy. That's what you see, the title. So you see that title. I don't have to worry about it. That just deals with statutes that govern the methods of sending information, which Mr. Lucas has conceded that the BIBA isn't about that. It doesn't involve that. So if there's a conflict between the title and the body of the endorsement, you have to resolve that conflict in favor of coverage and in favor of the insurer. That's black letter law in Illinois. So that's ambiguous then, what the title says versus what the body says. Great. Exactly. It creates the ambiguity, which you have to resolve in favor of coverage and in favor of the insurer. Another question that if I were the panel that I'd have for West Bend here is, since it issued its policy to Krishna in 2015, has it added an additional endorsement to its policy that specifically mentions BIBA or the recording and distribution of information or collection of personal data? My guess is that they probably do and that they probably added a specific endorsement to their standard form policies, just like with the TCPA. The insurance industry reacted, right? There are all these TCPA claims coming in, and they're being tendered. Courts were finding that there was coverage, and so the ISO issues a form that specifically names the TCPA, the CAN-SPAM Act, and says, look, these aren't covered. Add these to all your policies to ensure that we're not exposed to this risk. And West Bend says, well, yeah, the purpose of this, the intent of this exclusion was to prevent settlements for these types of class action violations. Well, if you look at the endorsement, it looks like it was created in 2005, which was three years before BIBA was enacted. We don't know that, though. We don't know that. Correct. But West Bend could have, if it wanted to, because it's a draft of the policy specific to this endorsement. It could have put BIBA in the endorsement if it wanted to, just like the TCPA was named specifically in the endorsement. But now it's relying on a catch-all provision that, like we said, it's our position that it conflicts with the title. Quickly, in terms of our cost appeal, there's going to be an issue as to the standard of review. I'm sure that Mr. Nix is going to argue that it's abuse of discretion. I would submit to the court that it is de novo, because Judge Valderrama didn't do any credibility determinations. There was no oral discovery. You guys are going to be looking at the exact same. But how is this accidental? Is not this endorsement all about an accidental data breach? And don't they have a strong argument? The data compromised. Let me back up. All they need is an arguable basis to deny coverage. They don't have one, because I think they missed part of the definition of personal data compromise. They missed it. They focused solely on the definition that says, lost, theft, accidental release or accidental publication of protected information. They're saying there's no accident here because it's part of the membership program, the collection and use. We agree. But if you then look, and this is at the record C-230, personal data compromise also includes, and this is in quotes, disclosure or abandonment of personally identifying information or personally sensitive information without appropriate safeguards. And the policy further provides that the failure to use appropriate safeguards must be accidental. Yes. All right? Where is the accident? Yes. That's my question. I've got it. So the accident is on page 39 of the common law record. Sakura alleges that Krishna disclosed her private biometric data to a third party and that it was negligent. Krishna was negligent, here's quotes, in failing to implement reasonable procedural safeguards around the collection and use of her biometric identifiers and biometric information. That is accidental. That's an accident. Whoops, we forgot to comply with BIPA. Whoops, we forgot to put in the safeguards that BIPA requires. That's negligence. That's covered, clearly, unequivocally covered. But yet West Bend, I think, missed it and focused solely on the initial definition, which it's also relying on here on appeal. And my client has had to spend a significant amount of resources to demonstrate that there is. What are the safeguards that BIPA requires? BIPA says don't do it. It doesn't say do it. BIPA doesn't say, no, BIPA doesn't say don't do it. BIPA says if you're going to do it, this is what you have to do. If you're going to collect it, you have to tell the person you're collecting it from where it's going to be, what's going to happen to it, where it's going to go. You have to get their consent to collect it. Okay. And so in your view, those are all clearly safeguards. Those are safeguards. Okay. And that this information was disposed of or given to somebody else. You're out of time, but I have just one last question. Yes. Which is your entire 155 argument rests on a theory of coverage, which was not the theory of coverage of which you prevailed below, right? Nobody's found that you're even entitled to coverage under this endorsement. Nobody's found. And, unfortunately, the circuit court didn't get to that. I believe that if it had, it would have agreed with us and sided with us. If you're trying to figure out what judges do, they usually do the easiest thing. So if it was so easy and clear, why wouldn't the judge do it? No, I don't judge by the law. I mean, he would. He's very hard working. Especially on this one. I mean, look at the memorandum opinion order that he issued. I did. Right. Well, he did some significant work on that. So I think that he should be commended for that. That's why I'm in a difficult position to say that, you know, he missed something. Because he was very thorough. Okay. Counselor, do you sufficiently argue the method of communication part of this? Method of communication? Well, as far as the second argument, the regulating of the methods of communication as far as the act. No, you did fine. If I didn't, my co-defendant here could probably clean that up for me. Thank you. Thank you. Good afternoon, Your Honors. May it please the Court. My name is Ben Thomas, and I'm here representing Claudia Secura, the other defendant in this appeal, or appellee. Sometimes a plaintiff, now she's a defendant.  I don't know where I'm going. So I think Your Honors and counsel have generally addressed the most relevant issues today. I just want to touch on a couple points on the publication issue first. Justice McVaugh, you and counsel just discussed about how in Valley Forge there's a very different privacy claim at issue, and that's what led the Supreme Court there to focus on the definitions of the term publication that fit with the claim at issue in that case. It was a direct defendant-to-plaintiff communication, and so that's why it looked at whether or not that singular communication was also part of a broader to-the-public dissemination such that it could trigger publication coverage. I think it's notable that the starting position of every party in that case was, of course, third-party disclosures are publications, right? That's why the Court did address it. That's why it didn't come up at all until the Supreme Court raised it sua sponte in its opinion. And counsel for West Bend noted that there's no Illinois cases dealing with this publication issue but suggested that the Court look to the opinions of other states, and I recommend that the Court do exactly that. One place you can look is the Springdale Notice case that's cited in West Bend's brief where they say that common sense dictates that a layperson would understand the term publication to mean the communications of words to a third person, which is exactly what we have here under the exact standard that this Court's required to follow when determining how a reasonable person in the position of Krishnatan would interpret the term publication in the policy. Another place the Court could look is the Park University case, which was focused on by the Second District Court of Appeals in the Valley Forge case. There, the Park University case, that's from the District Court of Kansas, looked at the term publication and, similar to some of the observations made by Your Honors today, found that the term can have multiple meanings. It can mean a third-party disclosure of information, or it can just mean the release of information. And because of that, the Park University Court found that the term was ambiguous, and as we all know, if there's an ambiguous term in an insurance policy contract in Illinois, that means you have to construe it sharply in favor of coverage. And so I think the Court could take one of two roads today. The Court could either look at the broad definition of the term publication that the trial court used, in this case that the Seventh Circuit used in Defender Security that some of the other courts have used as well, and find that the term publication from an ordinary common-sense meaning just means the release of information, or the Court can find that it has multiple meanings in multiple contexts, and for that reason you have to find that coverage exists here. And I think another good place to look is the policy itself, which, Justice McFadden, as you noted, the policy uses the exact same term, oral written publication of material, to describe both defamation-related injuries and privacy-related injuries. And for that reason, because there's no specific definition for the term, as you noted, Justice Connors, there's no reason to think that the definition or the scope of publication should vary from one coverage provision to the next. So that's another reason why this Court should find that the trial court got the publication question right and find that there is coverage here. Counsel, do you think there's any ambiguity in Section 15D of the Act as far as how that applies, like the TCPA cases? You mean that? Go ahead. Sorry, you're referring to the biometric Act? Right, right, right, right. Because Counsel Clemmons, it's very similar to TCPA and it should be looked at the same way. But do you think there's any ambiguity in how that should be applied, 15D? I don't think there's any ambiguity as it matters for this case, right? So I'll leave the publication issue aside, and I think this bears more towards the statutory exclusion that you were just talking with Counsel about. And I think Counsel hit the point right, is that the inquiry this Court has to take is you have to look at the exclusion as a whole, as it was presented to the insured, and figure out how the insured would interpret it. And so the exclusion at the very top, in all caps, bold-faced, says that is an exclusion that applies to statutes that govern things like phone calls, faxes, e-mails, and other methods of sending information. Counsel for Westbend said, well, you know, there's really only one way to read the exclusion. I think it's notable that when he said that, the only thing he focused on was the catch-all provision at the bottom of the exclusion itself. And I think the only way that you can read it is by looking top to bottom and noting that the entire thing is consistent. When you talk with Counsel for Krishna Tan, he suggested that the use of the catch-all versus the title might create an ambiguity, and I agree with that. It might. But I think there's also a way to read the exclusion consistently and find that the bit by it just doesn't fit within it, because what you do, you start at the top, you note that it's an exclusion that applies to statutes that govern, again, phone calls, faxes, e-mails, other methods of sending information. You go down to the two examples it gives you. One is the TCPA. That's a statute that governs phone calls and faxes specifically. It next talks about the CAN-SPAM Act. That's a statute that governs e-mails. And then it gives you a catch-all term, which the Court should interpret as consistent with the other items in the list. And so the question the Court is left with is whether or not the BIPA fits within that, the exclusion scheme, in the same way that the TCPA and CAN-SPAM Act does. And it doesn't because, as Counsel for Westbend admitted, the BIPA doesn't say a single word about any method of sending information whatsoever. And so that brings me back to your question, Justice Connors. There are similarities between the TCPA and the BIPA, right? Of course there are. They both provide for statutory damages. Westbend points that out in its brief. And it's also true that they both concern privacy. There are different kinds of privacy, but they both concern privacy. But those similarities don't matter. The only similarities that do matter to the Court's analysis today is whether or not the BIPA fits within the list of statutes given the exclusion in the same way that the TCPA and CAN-SPAM Act do. And for the reasons I just stated, it does not because it doesn't say anything about e-mails, phone calls, faxes, or any other method of sending information. And I did look in preparing for argument today about whether this court, any Illinois court, has dealt with considering titles in insurance policies and endorsements. And the only case I found where a court applying Illinois law did not consider a title was a case out of the Northern District of Illinois. It's Conagra v. Arclight Mutual Insurance from 1999. And the reason the court didn't consider the title of an endorsement in that case was because the insurance policy specifically said, don't consider the title. There was a title exclusion clause, right, that said the parties shall not rely on titles of any insurance policy or title of any section or endorsement in this policy when figuring out whether or not there's coverage. So the court said, I have to construe the policy as a whole, so hands off that, right? There's nothing like that in this case. That's why Counsel for West Bend won't give you a straight answer when you're asking him to rectify the exclusions title with the rest of the text. You are out of time unless anybody else has any questions. Thank you very much. Thank you, counsel. Thank you. Briefly, your honors, first I'll talk about what section 155 and counsel's disposal argument, which is the argument he is making here before your honors as to why the endorsement applies. The first appearance of that argument was in their reply brief on their cross appeal. That disposal argument wasn't made in their main brief, and it wasn't made to the circuit court. So I think that argument was waived. But also... But if it weren't, how would you respond to it? Well, I think... Because you haven't had a chance to respond to it. It was never brought up. So if you can't respond to it at this moment, that's fine, too. But I think you're kind of hit on the nail on the head. I mean, there isn't an accidental disposal. That's not what's alleged in the complaint. Nobody has alleged that Krishna disposed of anybody's biometric information. They allege that it was communicated to Sunlink. There's no disposal involved here. So I think the argument itself, even though it was waived, doesn't hold up. No argument of it being lost or stolen or anything. There is no argument that it was lost or stolen and no argument that it was accidentally communicated or distributed. Going to the arguments regarding first publication and somehow the security or seclusion and secrecy issues turned the Valley Forge opinion toward its definitions, which were solely communication to the public. If you look at the Valley Forge opinion, first off, when the defendants, the insurer and the insurer, got there, the argument they made was that the communication of these blast tracks to thousands of people was communication to the public. And the Supreme Court adopted that definition of publication and applied it in several places within the opinion to hold that publication for invasion of privacy purposes was communication to the class of recipients, not to one person or to one individual, but to the allegations in Valley Forge to thousands of people. And that's the same allegation that's in the Sakura complaint, that the biometric information is a class they allege of thousands. So there's, you know, there's potentially thousands of people whose biometric information was disclosed, but it was disclosed to one person and that's not disclosure to the public. So the coverage doesn't apply. And as to the exclusion, I get back to the fact that if you read the exclusion, from top to bottom, from title to paragraph three, the only reasonable interpretation is that the statute violation, it doesn't matter how the communication is made. It's if the statute is violated. If personal injury is suffered by the violation of the statute that prohibits the communication of information, which is exactly what Sakura alleges in terms of the BIPA violation for disclosure to some length. The method isn't important. The disclosure is. The alleged disclosure in violation of BIPA brings the Sakura complaint within the exclusion and therefore the exclusion should apply. Thank you. Thank you, Your Honor. Thank you. Oh, you get a rebuttal. You do. You do. First of all, we'll concede that the first time that we raised that disclosed argument is in our final reply. I would ask the Court nonetheless to take a look at it. You always hate to say this, but waiver is a limitation on the parties, not the Court. We don't hate to say that. Right. If the Court would be so inclined to take a look at it, I believe that you would find that this disposal doesn't need to be accidental. It just needs to be the disposal in conjunction with the failure to comply with safeguards. It has to be accidental, and I believe that's sufficiently alleged in the underlying complaint. And I also provided the Court with a definition of disposal, because it's an undefined term, which is kind of common here, that includes to transfer into new hands, and that's exactly what happened here. The private information was transferred into new hands, into a third party. So I would ask the Court to reverse that part of the Circuit Court's finding, but affirm as to the rest. Thank you, Your Honor. Thank you. And thank you all. The briefing on this was really quite quick, and that's appreciated. And the argument as well. And the argument as well. Yes. Yes, absolutely. All right. We will take this under advisement. You will hear from us shortly.